UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| NORVELL SKIN SOLUTIONS, LLC, | ) |
|     Plaintiff/Counter-Defendant, | ) ) ) |
| v. | ) ) | Case No. 2:13-cv-0117<br>Judge Aleta A. Trauger |
| SOLAIRE PTY LTD., | ) ) ) |
|     Defendant/Counter-Plaintiff, | ) ) |
| And<br>    Andrea Taylor, | ) ) ) |
|     Defendant. | ) |

# MEMORANDUM

Solaire Pty Ltd. ("Solaire") has filed a Motion for Partial Dismissal of Counterclaim (Docket No. 37), to which Norvell Skin Solutions ("NSS") has filed a Response in opposition (Docket No. 42), and Solaire has filed a Reply (Docket No. 45). For the reasons stated herein, the motion will be granted in part and denied in part as moot, and the court will permit Solaire to file an amended tortious interference counterclaim.

## BACKGROUND

### I. Basic Facts and Procedural History

Both NSS, a Tennessee company, and Solaire, an Australian company, sell sunless spray tanning products. Between 2007 and 2012, they had a business relationship, the deterioration of which led to the claims and counterclaims at issue in this case.

NSS manufactured and sold products under the "Norvell" brand, manufactured and sold products under the "Amber Sun" and "Organic Sun" brands, and manufactured private-label

1

products for Solaire under the "Solaire" brand. Solaire similarly sold and manufactured products under the "Solaire" brand, the "Norvell" brand, and the "Mediterranean Tan, Wax & Beauty" ("Mediterranean") brand. To make a long story short, the parties' pre-existing business relationship deteriorated, leading to disputes about their respective trademark rights (including the alleged infringement thereof) and contractual rights related to the marketing and distribution of "Solaire"-branded products in Australia and New Zealand.

On November 7, 2013, NSS filed this lawsuit against the defendants, asserting claims for trademark infringement, breach of contract, unfair competition, and unjust enrichment.[1] (Docket No. 1.) Solaire filed an Answer and Counterclaims ("Counterclaims") against NSS for trademark infringement and tortious interference with prospective business relationships under Tennessee law.[2] The court held an initial case management conference and issued an initial Case Management Order on April 11, 2014. (Docket No. 41.)

In its Motion for Partial Dismissal, NSS argues that Solaire's Counterclaims fail to allege sufficient facts to support a tortious interference claim under the Rule 12(b)(6) standard. Neither NSS's claims against the defendants nor Solaire's counterclaim for trademark infringement are at issue here.

## II. **Facts Relating to the Tortious Interference Claim**

---

[1] The Complaint originally named Adam Taylor as a defendant. On February 27, 2014, the parties filed a Stipulation of Dismissal of Mr. Taylor. (Docket No. 24.)

[2] Both Solaire and individual defendant Andrea Taylor answered the Complaint. Only Solaire asserted counterclaims.

Solaire alleges that, during or after the deterioration of the parties' business relationship, NSS engaged in efforts to injure Solaire's ability to market some of its products in the United States in two ways.

First, NSS allegedly attempted to prevent Solaire from pursuing marketing and distribution opportunities through an important Nashville tradeshow. Solaire markets and distributes its "Mediterranean" products in the United States, primarily through trade shows and trade magazines. In October 2013, NSS allegedly sought to prevent Solaire from displaying Solaire's "Mediterranean" products at the Smart Tan Downtown trade show in Nashville, which Solaire represents is the largest indoor tanning trade show conference in the world. To accomplish its goal, NSS allegedly told the trade show organizers that NSS intended to bring legal proceedings against Solaire.[3] According to Solaire, this "unlawful interference" by NSS caused Solaire to incur unspecified "additional expenses associated with the trade show."

Second, NSS allegedly convinced a Solaire distributor to cease doing business with Solaire. According to Solaire, Heartland Tanning ("Heartland") (1) is one of the largest distributors of sunless tanning products in the United States – distributing products for NSS,

---

[3] At times, Solaire attempts to supplement allegations in the Complaint with additional representations in its response brief. For example, the brief states that "NSS spread rumors to the organizers of the Smart Tan Downtown trade show . . . about NSS's intent to file this baseless lawsuit and told the organizers not to allow Solaire to exhibit at the show as a result." (Docket No. 42 at p. 2.) By contrast, the relevant portion of the Complaint simply states as follows: "In or around October 2013, upon information and belief, Norvell [] attempted to prevent Solaire from displaying its Mediterranean-branded products at the Smart Tan Downtown trade show in Nashville – the world's largest indoor tanning show and conference – by informing the trade show's organizers that Norvell was planning to bring legal proceedings against Solaire." (Docket No. 25 at p. 12.) The court must rely on the allegations within the four corners of the Complaint, which, in some instances, are more mundane than those asserted by counsel in Solaire's brief.

Solaire, and other brands – and (2) manufactures sunless tanning booths for Solaire. In 2013, Heartland had planned to distribute Solaire's Mediterranean-branded products in the United States. As of that time frame, Heartland and Solaire had an existing business relationship: Heartland had been purchasing Solaire sunless tanning equipment and had included Mediterranean-branded products in Heartland's product catalogs, reflecting Heartland's intent to include those products in Heartland-manufactured tanning booths. According to Solaire, NSS learned that Heartland was planning to distribute Solaire's Mediterranean-branded products, at which point NSS's chief executive contacted Heartland. That executive allegedly (1) "disparaged" Solaire to Heartland and (2) told Heartland that NSS would cease allowing Heartland to distribute NSS's products, unless Heartland ceased distributing Solaire's products. Solaire alleges that NSS's "predominant purpose in threatening Heartland was to injure Solaire." Solaire alleges that NSS's efforts were successful: Heartland informed Solaire that it would not distribute Solaire's products because of NSS's threats. Since that time, Heartland has not purchased any products or equipment from Solaire.

## MOTION TO DISMISS STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not

whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## ANALYSIS

### I. Tortious Interference[4]

The instant motion presents difficult open issues concerning the appropriate application of a tortious interference claim to a dispute involving competitors. Although the court ultimately will permit Solaire to amend its tortious interference counterclaim, these issues merit substantial analysis.

#### A. *Trau-Med*, Improper Motive, and Improper Means

In 2002, in *Trau-Med*, a case that did *not* involve two competitors, the Tennessee Supreme Court adopted the tort of interference with prospective business relations. *Trau-Med. of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002). As articulated by the court in

---

[4] Solaire asserts a counterclaim for tortious interference with prospective business relations, not a claim for tortious interference with existing or contractual relations. Subject to that clarification, and for ease of reference only, the court will refer to Solaire's counterclaim as a "tortious interference" claim.

*Trau-Med*, a tortious interference claim has the following elements: (1) an existing or prospective business relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to cause the termination of that relationship; (4) the defendant acted with an "improper motive" *or* used "improper means"; and (5) the plaintiff suffered injury as a result. *Id.* Here, NSS argues that Solaire's allegation cannot satisfy the fourth element of this standard.

As subsequent courts have recognized, the fourth element of a tortious interference claim can be satisfied by showing either "improper motive" or "improper means." *See, e.g., Watson's Carpet & Floor Coverings, Inc.v. McCormick*, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007) ("It is important to note that *either* "improper motive" or "improper means will suffice.") (emphasis in original); *see also Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 629, 640 (M.D. Tenn. 2006). In an oft-cited footnote, the *Trau-Med* court stated that "[i]t is clear that a determination of whether a defendant acted 'improperly' or possessed an 'improper' motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term 'improper' is neither possible nor helpful." *Trau-Med*, 71 S.W.3d at 701 n. 5. With respect to "improper motive", the court explained that "we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff." *Id.* With regard to "improper means," the court stated as follows:

> We cite the following methods as some examples of improper interference: means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* (internal citations omitted).

The *Trau-Med* formulation is broad, open-ended, and can be difficult to apply in the abstract. Furthermore, by apparently separating "improper motive" from "improper means," the *Trau-Med* formulation deviates somewhat from the Restatement approach adopted in many jurisdictions. Courts and parties understandably struggle to determine the circumstances under which "improper motive" and "improper means" are distinct, and how that distinction may be relevant to a particular set of factual circumstances.[5]

### B. The Competitor's Privilege Exception to "Improper Motive"

Prior to *Trau-Med*, the Tennessee Supreme Court had decided *Polk & Sullivan*, a case involving a claim for interference with contractual relations. *See Polk & Sullivan, Inc. v. United Cities Gas Company*, 783 S.W.2d 538 (1990). There, in reliance on the Restatement (Second) of Torts § 768, the court had held that a competitor was entitled to interfere with a competitor's contract with a third party to acquire business for itself, under the following conditions:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) The relation concerns a matter involved in the competition between the actor and the other and
> (b) *The actor does not employ wrongful means* and
> (c) His action does not create or continue an unlawful restraint of trade and
> (d) His purpose is at least in part *to advance his interest in competing with the other*.

---

[5] Here, the parties argue at some length about the applicability of the reasoning of cases from other jurisdictions. Without a clear indication that the standards applied in other jurisdictions are equivalent to Tennessee's formulation of the tort in *Trau-Med*, the court is hesitant to read too much into the reasoning of courts applying versions of the tort that may differ in material respects from Tennessee's version. Subject to that caveat, the court has considered the parties' references to these cases.

*Id.* (citing Restatement (Second) of Torts § 768(b)) (emphases added). The exception recognized in *Polk & Sullivan* is often referred to as the "competitor's privilege."[6]

Following *Trau-Med*, it was not entirely clear whether the competitor's privilege survived that decision. In *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, the Tennessee Court of Appeals addressed this issue in *dicta*. There, in most relevant part, the plaintiff carpet dealer, Watson's Carpet ("Watson")[7] claimed that its competitor, Carpet Den, had convinced a carpet supplier to cease supplying a particular brand of carpet to Watson, which in turn caused Watson to lose a customer that only utilized that brand of carpet. *Watson's Carpet*, 247 S.W.3d at 172-173. The case was tried to a jury, which found, among other things, that Carpet Den had "intentionally and improperly interfered with Watson's [] business relationship with [the carpet supplier] causing [the supplier] to refuse to sell Watson carpet" for resale to Watson's customer. *Id.* at 173-174.

The *Watson's Carpet* court recognized that application of *Trau-Med* to the circumstances presented in *Watson's Carpet* raised difficult doctrinal and policy issues. *See id.* at 174-177. In particular, the *Watson's Carpet* court expressed concern that applying the *Trau-Med* factors without qualification to a competitor-against-competitor dispute could have "unintentional consequences that may serve to negatively impact competition in the marketplace and weaken the contract as a cornerstone of our business community and economy." *Id*. at 177.

---

[6] It does not appear that any Tennessee case has squarely addressed whether the privilege operates as a presumptive defense that the plaintiff must overcome (at the pleading stage or at trial) or as an affirmative defense for which the defendant bears the burden of proof.

[7] In the *Watson's Carpet* opinion, the court defined the plaintiff as "Watson." In this opinion, the court similarly will refer to the plaintiff as "Watson" but will refer to the opinion as "*Watson's Carpet*," as other courts have done. *See, e.g., PPG Indus. v. Payne*, 2012 WL 1836314, at *3 (E.D. Tenn. May 21, 2012).

With that concern in mind, the *Watson's Carpet* court observed that applying *Trau-Med*'s "predominant purpose to injure" standard for "improper motive" could "be difficult" in cases involving competitors, because, "when two competitors are competing over the same business, separating the interest in improving one's own business and taking business away from the competitor would seem problematic." *Id.* at 183. The *Watson's Carpet* court acknowledged that "the 'predominant purpose' language in *Trau-Med* could be read as indicating that a competitor who not only wants to secure the business for itself but also wants to injure the competitor (logically, in some way additional to the loss of the business over which they are competing) may be held liable for wrongful interference, depending on which motive predominates." *Id.* Nevertheless, in *dicta*, the court stated that it believed that the Tennessee Supreme Court, if faced with the issue, "would hold that a competitor enjoys a privilege as to the improper motive requirement of the fourth element of the tort of intentional interference with business relationships." *Id.* The court expressly declined to decide the issue, however, because it found that the facts presented at trial sufficiently supported a finding of "improper means," which provided an alternative basis for upholding the jury's verdict that Carpet Den tortiously interfered with Watson's business relationship with the carpet supplier. *Id.*

Although the relevant discussion in *Watson's Carpet* is *dicta*, the court finds it to be persuasive as to how the Tennessee Supreme Court would likely decide the issue. Some practical limits must be placed on a tortious interference claim, lest every attempt to acquire business lead to a tortious interference claim that will survive the pleading stage based on a dispute about a competitor's actual "motive." Moreover, this court finds no suggestion in *Trau-Med* that the decision was meant to abrogate *Polk & Sullivan* or that a competitor's privilege

9

should not otherwise be available for a suit between competitors. Indeed, *Trau-Med* did not involve competitors, so the competitor's privilege was not at issue.

The court therefore finds that the competitor's privilege applies here and, if satisfied, could preclude Solaire's tortious interference counterclaim against NSS to the extent it is premised on an "improper motive" theory of liability.

## II. Application of the Competitor's Privilege

The court's finding that a competitor's privilege *can* protect NSS is only the first step. The court must next determine whether, even viewing Solaire's allegations in the light most favorable to Solaire, the facts establish the privilege in favor of NSS.[8]

As Solaire points out, the competitor's privilege applies only where a defendant was, at least in part, attempting to further its interest in competing with the plaintiff. Solaire contends that its allegations sufficiently establish that NSS's actions show that NSS was not actually attempting to secure any business for itself but instead simply sought to injure Solaire. Solaire also states in a footnote that, if granted leave by the court, it would allege additional conduct showing that NSS harbored only an intent to injure Solaire and did not act in furtherance of a legitimate business purpose.

In response, the defendants chiefly rely on *PPG Indus. v. Payne*, 2012 WL 1836314 (E.D. Tenn. May 21, 2012), an unpublished decision in which the district court granted summary

---

[8] The parties have not adequately briefed whether the court should treat the competitor's privilege as a pleading requirement or as an affirmative defense. At any rate, given the concerns expressed in *Watson's Carpet* about tortious interference claims becoming an unintended impediment to lawful competition in disputes between competitors, the court is inclined to find that Solaire's allegations must show why the application of the competitor's privilege is not a *fait accompli* in order to survive dismissal, regardless of whether the privilege is an affirmative defense.

10

judgment to the plaintiff on the defendant's tortious interference counterclaim. The plaintiff, PPG, had produced evidence that the defendant, Payne, had taken a number of actions to (in Payne's words) "crush" the plaintiff's business. *Id.* at *4. With respect to PPG's theory of improper motive, the district court summarily held that, because the case involved direct competitors, "PPG would be subject to the competitor's privilege regarding the showing of a bad motive for element four of the tort." *Id.* The court therefore considered only whether Payne had established that PPG had engaged in "improper means" of interference, and held that it had not. *Id.* at 4-6. Here, NSS argues that, among other things, *PPG* demonstrates that an "improper motive" theory by Solaire must fail because the competitor's privilege precludes the claim.

However, in its analysis, the district court in *PPG* appears to have skipped an important step in the analysis: namely, whether the predicates for the competitor's privilege were met in the first place. In other words, as this court construes the competitor's privilege, it is not enough for a competitor to say: "I am a competitor; therefore I am shielded from any tortious interference claim premised on the notion that I acted with 'improper motive' in interfering with the claimant's competing business." Instead, the competitor must establish, among other things, that it was motivated at least in part by an "interest in competing with the other" business, as set forth in the Restatement factors cited in *Watson's Carpet*. Although separating a competitor's alleged intent to injure from its (conceivable) intent to compete "may be difficult" – as the Court of Appeals acknowledged in *Watson's Carpet* – it does not mean that adjudicating the issue is presumptively impossible.

Here, the court need not rule on the sufficiency of Solaire's allegations of improper motive at this time. As explained in the next section, the court is granting Solaire leave to amend its (currently insufficient) allegations concerning an "improper means" theory of tortious

11

interference. In the interest of fairness and judicial economy, the court will similarly permit Solaire to amend its allegations as they relate to an "improper motive" theory of liability. The court therefore will not rule on the sufficiency of the present allegations of improper motive, and the court expresses no opinion as to whether the amended allegations will be sufficient.

### C. Improper Means

NSS argues with some force that comments to the Restatement should control here. Specifically, it points to § 767 cmt. e, which provides a comment concerning "improper means" as an element of the competitor's privilege. With respect to that issue, the comment provides as follows:

> The predatory means discussed in § 767, Comment *c*, physical violence, fraud, civil and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure. . . . . *[H]e may refuse to deal with the third persons in the business in which he competes with the competitor if they deal with the competitor.* Or he may refuse other business transactions with the third person relating to that business . . . .

*Id.* (emphasis added). NSS also observes that, in many other jurisdictions, courts have found that economic pressure exerted by a competitor does not amount to "wrongful means" unless it is independently actionable. Regardless, NSS argues that the allegation that it convinced Heartland to cease doing business with Solaire is insufficient to constitute "improper means."

Again, squaring the *Trau-Med* formulation with the Restatement standard and its application in other jurisdictions is a tricky venture. As discussed herein, the *Trau-Med* formulation of "improper means" is broader than just independently actionable conduct: it also includes "threats or intimidation," "unfounded litigation," "misrepresentation or deceit," "undue influence," and efforts that "otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition." As the court in *Watson's Carpet* recognized, these "catch-

12

all" categories of "improper means" are "[l]ess susceptible to a clear definition." 247 S.W.3d at 176-77.

Here, Solaire's Response seems to conflate the "improper motive" and "improper means" inquiries, contending that its allegation that NSS had a predominantly malicious purpose thereby establishes "improper means." However, Solaire has not identified any case contravening the principle articulated in comment e to § 767 of the Restatement, which provides that a company may refuse to do business with a third party if that third party continues to do business with a competitor.[9] Without more, that type of competitive pressure is insufficient to show improper means. However, the *means* by which NSS allegedly convinced Heartland to stop doing business with Solaire could be improper, depending on what types of statements NSS made to Heartland about Solaire. For instance, if NSS defamed Solaire, convinced Heartland to stop doing business with Solaire based on misrepresentations or deceit, or otherwise engaged in unethical conduct, *Trau-Med* suggests that NSS could be liable for tortious interference.

Here, Solaire alleges that NSS "disparaged" Solaire to Heartland, but Solaire provides no details concerning the nature of that disparagement. Thus, there is no indication that NSS's alleged disparagement falls within one of the categories of conduct constituting "improper means" in *Trau-Med*. Therefore, Solaire has failed to state a claim for tortious interference premised on an "improper means" theory.

Because it is conceivable that Solaire could provide sufficient allegations to support an improper means theory of liability, the court will permit Solaire to amend its tortious interference counterclaim in an effort to avoid dismissal with prejudice.

---

[9] To take an example cited by NSS, if the answer were otherwise, it would be unlawful for Coca-Cola to refuse to do business with an entity that sells Pepsi products, and vice-versa.

13

## CONCLUSION

For the reasons stated herein, the Partial Motion to Dismiss will be granted in part and denied in part as moot. To the extent that it is premised on an "improper means" theory of liability, Solaire's tortious interference counterclaim will be dismissed without prejudice. The court will permit Solaire to amend its tortious interference allegations as to both "improper motive" and "improper means" theories of liability.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge